**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOHNNIE PARKER, *et al.*,

       Plaintiffs,

   v.

JOHN MORIARTY & ASSOCIATES,

       Defendant/Third Party Plaintiff,

   v.

STRITTMATTER METRO, LLC,

       Third Party Defendant/Fourth Party
       Plaintiff,

   v.

ENVIRONMENTAL CONSULTANTS AND
CONTRACTORS, INC.,

       Fourth Party Defendant.

Civil Action No. 15-1506 (CKK)

**MEMORANDUM OPINION**
(December 14, 2016)

Plaintiffs Johnnie Parker and Starrelette Gail Jones-Parker bring this action against Defendant/Third Party Plaintiff John Moriarty & Associates of Virginia LLC ("JMAV"). Plaintiffs allege that JMAV, as general contractor of a construction project, was negligent resulting in serious injury to Plaintiff Johnnie Parker, a construction worker on the project site. Defendant JMAV subsequently filed a Third Party Complaint against Third Party Defendant Strittmatter Metro, LLC ("Strittmatter"), and Strittmatter, in turn, filed a Fourth Party Complaint against Fourth Party Defendant Environmental Consultants and Contractors, Inc. ("ECC"). Presently

before the Court are Fourth Party Defendant ECC's [48] Motion to Dismiss the Fourth-Party Complaint and Third Party Defendant/Fourth Party Plaintiff Strittmatter's [54] Motion *Nunc Pro Tunc* for Leave to File Its Fourth-Party Complaint Against ECC.   Upon consideration of the parties' submissions,[1] the applicable authorities, and the record as a whole, the Court shall GRANT Third Party Defendant/Fourth Party Plaintiff Strittmatter's [54] Motion *Nunc Pro Tunc* for Leave to File Its Fourth-Party Complaint against ECC and shall DENY Fourth Party Defendant ECC's [48] Motion to Dismiss the Fourth-Party Complaint for the reasons stated herein.

## I. BACKGROUND

This action arises out of the construction work completed on the Apollo H Street project ("the project"), located at 600 and 624 H Streets, NE, Washington, D.C.   Compl. ¶¶ 6, 8, ECF No. [1].   Fourth Party Defendant ECC contracted with the Owner of the project to provide professional environmental services to the project.   4th Party Compl. ¶ 5, ECF No. [38]. Defendant/Third Party Plaintiff JMAV was the general contractor on the project.   Compl. ¶ 8.   Third Party Defendant/Fourth Party Plaintiff Strittmatter was hired by JMAV as a subcontractor to perform excavation and backfill work on the project.   3d Party Compl. ¶¶ 7, 8, ECF No. [10].   Plaintiff Johnnie Parker worked on the project as an employee of Strittmatter and alleges that on December 18, 2014, he was instructed to excavate between 600 and 624 H Street, NE, as part of his regular duties of employment.   Compl. ¶¶ 7-9.   Mr. Parker further alleges that he was injured while

---

[1] While the Court bases its decision on the record as a whole, its consideration has focused on the following documents: 4th Party Compl. Against ECC ("4th Party Compl."), ECF No. [38]; 4th Party Def.'s Mot. to Dismiss the 4th Party Compl. ("Def.'s Mot."), ECF No. [48]; 4th Party Pl.'s Opp'n to ECC's Mot. to Dismiss the 4th Party Compl. ("Pl.'s Opp'n"), ECF No. [53]; 4th Party Def.'s Reply Mem. of Law in Supp. of its Mot. to Dismiss the 4th Party Compl., ECF No. [56]; 4th Party Pl.'s Mot. *Nunc Pro Tunc* for Lv. to File its 4th Party Compl. Against ECC ("Pl.'s Mot. for Lv. to File"), ECF No. [54]. These motions are fully briefed and ripe for adjudication. In an exercise of its discretion, the Court finds that holding oral argument would not be of assistance in rendering its decision.  *See* LCvR 7(f).

performing this work because he was exposed to toxic chemicals from leaking underground storage tanks. *Id.* ¶¶ 10-15.

On September 16, 2015, Mr. Parker and his wife, Plaintiff Starrelette Gail Jones-Parker, filed the underlying Complaint in the instant action with a claim of negligence by and against JMAV, along with a claim for punitive damages based on JMAV's alleged willful, reckless, and wanton conduct. *See generally id.* On November 9, 2015, JMAV filed a Third Party Complaint against Strittmatter alleging claims of contractual indemnification and breach of contact. *See generally* 3d Party Compl. JMAV moved the Court for summary judgment on its contractual indemnification claim against Strittmatter based on Subcontract Agreement which the Court denied by written Order and Memorandum Opinion on May 23, 2016. *See* Order (May 23, 2016), ECF No. [42]; Mem. Op. (May 23, 2016), ECF No. [43].

On May 12, 2016, Strittmatter filed a Fourth Party Complaint against ECC alleging claims of negligence, indemnity and/or contribution as a joint tortfeasor, breach of contract to a third party beneficiary, and negligent misrepresentation. *See generally* 4th Party Compl. Strittmatter's claims against ECC are grounded in tort and in contract based on ECC's Professional Services Agreement ("the contract") with the Owner of the project. The contract dated November 1, 2014, as well as two plans prepared by ECC as part of that contract, the "Voluntary Remediation Action Plan" ("VRAP") dated August 22, 2014, and the "Environmental Health and Safety and Impacted Material Management Plan" ("EHASP") also dated August 22, 2014, were attached to the Fourth Party Complaint. *See* 4th Party Compl., Ex. 1 (Professional Services Agreement), ECF No. [38-1]; *id.*, Ex. 2 (Voluntary Remediation Action Plan), ECF No. [38-2]; *id.*, Ex. 3 (Environmental

Health and Safety and Impacted Material Management Plan), ECF No. [38-3].[2]  The Court shall briefly summarize the relevant portions of those documents, reserving further presentation of the facts for the discussion of the individual issues below.

Pursuant to the terms of the contract, ECC was authorized by the Owner to provide certain services, namely to prepare and implement the VRAP and provide services detailed in the EHASP. ECC agreed to perform these services "under the direction of [the] Owner, and to the reasonable satisfaction of [the] Owner."  Prof'l Servs. Agmt. at 1.  The contract clarified that ECC "shall operate as, and have the status of, an independent contractor and shall not act as or be an agent or employee of Owner. As an independent contractor, [ECC] . . . will be solely responsible for determining the means and methods for performing the Services . . . ."  Id. at 2.  The contract also provided that the "Owner is responsible for services performed by its Contractor, consultants and design professionals, but nothing herein is intended to relieve [ECC] . . . of its obligation to coordinate its Services with the services performed by the Owner's Contractor, consultants and design professionals."  Id.

Both the VRAP and the EHASP were formulated based on an Environmental Site Assessment conducted by Tom Hardy, ECC President, and John Diehl, ECC Senior Project Manager and a Certified Professional Geologist.  4th Party Compl. ¶¶ 28-31.  The VRAP set forth voluntary corrective actions to take due to the presence of soil and groundwater petroleum contamination at the project site.  VRAP at 18.  As noted in the VRAP, petroleum contamination at the site was attributed to underground storage tanks from a gasoline service station and automotive repair facility that previously were located at the site.  Id.

---

[2] In citing to the Professional Services Agreement, the VRAP, and the EHASP, the Court shall cite to the page numbers automatically generated by ECF in the header of each document.

The contract between ECC and the Owner provided that the VRAP would be implemented in order to receive a "Case Closure" or "No Further Action" determination pursuant to D.C. Municipal Regulation § 20-6211 which governs compliance with the District of Columbia Underground Storage Tank Management Act of 1990 as amended, D.C. Law 8-242; D.C. Code § 6-995 *et seq.* (1995 Repl.). *See* Prof'l Srvs. Agmt. at 11. The VRAP also indicated that the purpose of the voluntary correction actions was, in part, to "ensure the health and safety of future residents, construction workers, and area residents during construction . . . ." VRAP at 6, 18. The VRAP proposed remediation actions for the removal and disposal of the petroleum storage tanks during site excavation and "any orphaned (previously unknown) petroleum or chemical storage vessels or other underground vessels or structures encountered during excavation." *Id.* at 18. The remediation actions proposed in the VRAP also included the preparation and implementation of a site-specific EHASP for excavation and dewatering activities, including on-site air monitoring for construction workers and perimeter air monitoring for area residents. *Id.* Pursuant to the VRAP, all site excavation activities were to be conducted in accordance with the EHASP. *Id.* at 19.

The EHASP was prepared by ECC and reviewed and approved by companies performing work on the site, including Strittmatter as a subcontractor completing excavation work. EHASP at 3. The EHASP, which is discussed in further detail below, "outline[d] acceptable health and safety requirements and procedures related to the control of potential worker and environmental hazards from contaminated soil and water at the site, which may be encountered in the performance of their activities that intrude upon or disturb contaminated soil and/or water." *Id.* The Court shall further examine the relevant provisions of the EHASP in its discussion below.

Strittmatter now seeks the Court's leave to file its Fourth Party Complaint *nunc pro tunc* and ECC requests that the Court dismiss the Fourth Party Complaint for failure to state a claim

upon which relief can be granted.  Specifically, ECC asserts that Strittmatter's tort and contract claims against it fail as a matter of law and should be dismissed pursuant to Federal Rule of Civil Procedures 12(b)(6).

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint on the grounds that it "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  The Federal Rules of Civil Procedure require that a complaint contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam).  "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).  Rather, a complaint must contain sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court must construe the complaint in the light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations.  *In re United Mine Workers of Am. Empl. Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994).  Further, in deciding a Rule 12(b)(6) motion, a court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint," or "documents

upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011) (citations omitted).

### III. DISCUSSION

As an initial matter, Third Party Defendant/Fourth Party Plaintiff Strittmatter filed a Fourth Party Complaint in this action without first seeking leave to file the Complaint pursuant to Federal Rule of Civil Procedure 14.   Fourth Party Defendant ECC raised an objection to the filing of the Fourth Party Complaint without first seeking leave in its motion to dismiss.   Def.'s Mot. at 2 n.1. Strittmatter subsequently filed a motion for leave to file the Fourth Party Complaint *nunc pro tunc* to May 12, 2016, the date of the actual filing of the complaint with the Court.   *See* Pl.'s Mot. for Lv. to File.   This Court previously set May 13, 2016, as the deadline for the filing of motions to join additional parties.   Order (Mar. 28, 2016), ECF No. [36].   As such, Strittmatter timely filed its Fourth Party Complaint but failed to seek leave to do so.   Strittmatter has since sought to rectify this oversight by filing its motion for leave to file *nunc pro tunc* and noting that it "inadvertently neglected to seek the appropriate leave of Court."   Pl.'s Opp'n at 7.   Strittmatter requests that the Court excuse its neglect pursuant to Federal Rule of Civil Procedure 6(b)(1)(B), "in favor of judicial economy and efficiency of litigation."   *Id.*   The Court shall grant Strittmatter's request in light of the fact that it timely put ECC on notice of its claims through the filing of the Fourth Party Complaint, the claims in the Fourth Party Complaint are directly related to which party or parties can be held liable for Plaintiff Parker's alleged injuries, and Strittmatter's delay in filing the motion for leave to file the Complaint was due to Strittmatter's excusable neglect.   Moreover, Strittmatter has represented that it did not receive a complete copy of the contract at issue between ECC and the Owner until April 19, 2016, less than one month prior to the filing of the Fourth Party

Complaint.  Pl.'s Opp'n at 3.  As such, the Court shall grant Strittmatter's Motion *Nunc Pro Tunc* for Leave to File Its Fourth-Party Complaint Against ECC.

The Court now turns to the substance of the motion to dismiss based on ECC's assertion that Strittmatter failed to state a claim upon which relief can be granted.  Strittmatter through its Fourth Party Complaint raises four claims against ECC.  First, Strittmatter raises a negligence claim against ECC.  Specifically, Strittmatter contends that ECC had a duty to Strittmatter and others and, if Plaintiff Parker prevails on his claims, ECC breached the following duties: (1) to ensure the safety of workers on the project from volatile organic compound ("VOC") vapors; (2) to continuously monitor VOC vapors during excavation and warn of hazards; (3) to perform its services pursuant to the standard set for an environmental professional and/or a certified professional geologist; and (4) to institute safety precautions and regulate safety equipment in accordance with the contract, the EHASP, and the VRAP.  Second, Strittmatter argues that if it is found liable, it is entitled to indemnity and/or contribution from ECC because of ECC's negligence.  Third, Strittmatter asserts a breach of contract claim, asserting that it is a third party beneficiary of the contract between ECC and the Owner and that ECC breached the terms of that agreement.  Finally, Strittmatter raises a negligent misrepresentation claim against ECC, contending that "ECC directly and indirectly made knowingly and/or recklessly false and misleading statements about the environmental conditions at the H Street Project and failed to perform its duties in monitoring the Environmental Conditions pursuant to the ECC/Owner contract and the relevant statutes regarding undergrounds storage tanks."  4th Party Compl. ¶ 62.

ECC now moves to dismiss all of Strittmatter's claims against it.  Specifically, ECC argues that Strittmatter's claims fail as a matter of law for two reasons: (1) ECC owed no legal duty to Strittmatter and ECC was not responsible for ensuring worker safety on the job site; and (2)

Strittmatter was not an intended beneficiary of the agreement between ECC and the Owner.  ECC also contends that if the Court does not find Strittmatter's claims against ECC fail as a matter of law at this juncture, any claims between these two parties should be severed and tried separately because the agreement at issue contains a jury waiver provision.

**A.  ECC's Alleged Duties to Strittmatter**

ECC first argues that it does not owe a duty of care to Strittmatter or its employees and, as such, Strittmatter cannot recover from ECC for ECC's purported negligence.  In order to recover under a negligence theory, Strittmatter must demonstrate that ECC owed Strittmatter a duty of care, that ECC breached that duty, and that ECC's breach was the proximate cause of the injuries. *See Presley v. Commercial Moving & Rigging, Inc.*, 25 A.3d 873, 880 (D.C. 2011).  "Whether there is a duty of care is a question of law." *Id.* at 883.  However, "'[a] determination of whether a duty exists is the result of a variety of considerations and not solely the relationship between the parties.'" *Id.* at 888 (quoting *Bd. of Trs. of Univ. of District of Columbia v. DiSalvo*, 974 A.2d 868, 871 (D.C. 2009)).  In this jurisdiction, a common law duty of care may arise even in the absence of contractual privity. *See id.*  In determining whether such a duty exists, "whether a party should have foreseen that its contractual undertaking was necessary for the protection of the third party is important." *Id.*  Accordingly, a court must still examine the contract "to determine the scope of the undertaking as it relates to the protection of the third party." *Id.*  In addition to considering the contract itself, "[t]he existence of a duty is also shaped by considerations of fairness and 'results ultimately from policy decisions made by the courts and the legislatures.'" *Id.* (quoting *DiSalvo*, 974 A.2d at 871 n.2).

The District of Columbia Court of Appeals ("D.C. Court of Appeals") has adopted the approach in the Restatement (Second) of Torts for determining whether a party who performs

services pursuant to a contract to one party assumes a common law duty to an unrelated third party.

Specifically, the court explained:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
>> (a) his failure to exercise reasonable care increases the risk of such harm, or
>>
>> (b) he has undertaken to perform a duty owed by the other to the third person, or
>>
>> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

*Id.* at 889 (quoting Restatement (Second) of Torts § 324A).

The parties point to different provisions in the contract that each claims supports its position on the issue whether or not ECC assumed a duty of care to Strittmatter and its employees. Central to the parties' dispute is the EHASP which was prepared by ECC, in part, "to address the chemical contaminant risk potential during . . . excavation . . . ." EHASP at 19. As an initial matter, JMAV and Strittmatter, as a company performing excavation work on the project, were required to review and approve the EHASP. As part of that review and approval process, Strittmatter was required to acknowledge that the EHASP "outlines acceptable health and safety requirements and procedures related to the control of potential worker and environmental hazards from contaminated soil and water at the site, which may be encountered in the performance of their activities that intrude upon or disturb contaminated soil and/or water." EHASP at 3. Strittmatter also was required to agree to abide by the procedures outlined in the document and acknowledged that it understood "that the general contractor and other individual contractors are

responsible for compliance with these and all other applicable safety and health regulations, requirements and procedures for their own personnel." *Id.*

Indeed, the EHASP places the overall responsibility for site safety with JMAV and the subcontractors. Pursuant to the EHASP,

> The General Contractor [defined as JMAV and subcontractors] has overall responsibility for monitoring and enforcing *all aspects of site safety*, including *construction safety and all other safety*, health, and OSHA related requirements. These include, as appropriate, compliance with the following standards in regard to hazard awareness training, medical monitoring, *provision and proper use of personal protective equipment*, *site control*, decontamination of personnel and equipment, proper handling and disposal of contaminated materials (including soil, water, and equipment), and reporting injuries and hazardous materials exposures .
> . . .

*Id.* at 7 (emphasis added). Moreover, the EHASP provides: "It is the responsibility of the General Contractor and individual subcontractors to make provisions for health and safety training, material safety data sheets, health and safety operating procedures, personal protective equipment, and safety equipment and medical surveillance for their employees at this site." *Id.* at 22.

While the language of the EHASP appears to place the overall responsibility of monitoring and enforcing site safety with JMAV and the subcontractors, ECC's role remained ongoing as described in the EHASP. Pursuant to the scheme set forth in the EHASP, ECC was "responsible for monitoring site conditions in regard to chemical hazards during earthwork activities, notifying the General Contractor and subcontractors regarding potential chemical health hazards, and appropriate control measures to be used by personnel at the site." *Id.* at 7.

The EHASP also contemplated the roles of the Site Safety Officer, a safety representative of JMAV, and designated representatives of ECC including the Environmental Technician. *Id.* at 6. In terms of evaluating hazards at the job site, both the Site Safety Officer and ECC's

Environmental Technician monitored soil excavation work. *Id.* at 20. Specifically, the EHASP

provides:

> If suspect areas (*e.g.* petroleum or chemical solvent odor, staining, free product, pipe remnants, or unknown/suspected USTs [underground storage tanks]) are encountered, soil segregation and potentially soil characterization will be conducted prior to disposal. If monitoring by ECC indicates the presence of petroleum, VOC, or SVOC contaminants, ECC will perform a further hazard evaluation to determine the significance of the contamination and the potential for worker exposure.

*Id.*

The Site Safety Officer's responsibilities also included implementing both the General

Contractor Health and Safety Plan and ECC's EHASP. *Id.* at 20. In the event that those two safety

plans conflicted, the ECC plan would prevail on "environmental safety and health matters related

to impacted or hazardous materials at the site." *Id.* at 7; *see also id.* at 3.

ECC's Environmental Technician was on site "to monitor site conditions and perform air,

soil, and groundwater monitoring for potential environmental safety and health hazards associated

with potential petroleum or other VOC or SVOC contamination." *Id.* at 20. Specifically, the

EHASP provided that ECC would monitor excavation and site work on a daily basis for airborne

VOC contamination using a Photoionization Detector (PID) and would record the readings on log

sheets. *Id.* at 19. The EHASP also set forth certain procedures to be undertaken by ECC's

Environmental Technician if the readings reached specified levels. *See id.* In the event that

contaminated soil or water was encountered, the Site Safety Officer would request appropriate

procedures from ECC's Project Manager. *Id.* at 20.

The Site Safety Officer was delegated stop-work authority. *Id.* at 20. However, the

EHASP provided that if "ECC observes an imminent danger situation and/or serious health or

safety hazard, ECC shall take any action necessary to remove persons at risk from harm's way, as

soon as possible." *Id.*  This expressly included the authority to temporarily stop work, if deemed necessary in the judgment of ECC's Environmental Technician, until the Site Safety Officer was notified and the situation was rectified.  *Id.* at 21.  Notably, the EHASP took into account the possibility of encountering previously unknown underground storage tanks during excavation work.  *Id.* at 23.  In such instances, workers were directed to stop excavation immediately and notify the Site Safety Officer.  *Id.*

The EHASP also set forth recommendations for personal protective equipment for all workers on the site "[b]ased on the site hazard evaluation and general construction safety policies and procedures . . . ."  *Id.* at 24.  The recommendation was that workers on the site wear: "boot/shoes- leather, steel toe and shank"; "Hard hat (ANSI approved)"; "Standard work clothes – shirts and long pants at all times"; "Safety Glasses with sideshields (ANSI approved)"; and "Work gloves (leather, cotton, etc.)."  *Id.* The EHASP advised that if contaminated soil and/or groundwater was encountered, ECC would reevaluate the potential hazard by job activity and area, and might recommend additional levels of personal protective equipment.  *Id.*  As Strittmatter notes, respirators were not required personal protective equipment as outlined in the EHASP.

Here, the central issue that the Court must resolve is whether ECC should have recognized that its undertakings pursuant to the contract were necessary for the protection of Strittmatter. *Presley*, 25 A.3d at 889.  ECC argues that the Court can reach the decision that it owed no duty of care to Strittmatter as a matter of law at the motion to dismiss stage.  However, it is the Court's view that it cannot conclusively find that no such duty exists based solely on the language of these contract provisions and in light of the applicable legal principles, nor have the parties cited any authority which persuades the Court otherwise.  Indeed, in reviewing the contract, the VRAP, and the EHSAP in the light most favorable to Strittmatter, it appears that the provisions at least

contemplate ECC's role is not only in crafting the safety recommendations for the job site but also in monitoring the site safety conditions on a daily basis and taking certain steps, including potentially stopping work, in the event that hazardous conditions were detected.  These were provisions of the EHASP that Strittmatter was required to review and approve.

The record at this time lacks other evidence that might be relevant to the Court's analysis. Indeed, the Court has no evidence regarding ECC's actual role on the job site, the circumstances that allegedly gave rise to Plaintiff Parker's injuries, or ECC's actions at the time of the alleged injury.  While the Court in its foreseeability analysis must look to the terms of the contract, the Court also must look to the actual nature of ECC's undertaking based on the specific facts of this case.  Here, the Court cannot conclude that Strittmatter's tort claims fail as a matter of law based strictly on the language of the contract.

The Court notes that the parties rely on different cases which the Court does not find persuasive at this stage of the proceedings.   In those cases, the issue of whether a common law duty existed was resolved on a fuller record and not at the motion to dismiss stage.  ECC relies on the D.C. Court of Appeals' decision in *Presley v. Commercial Moving & Rigging Inc.*, 25 A.3d 873 (2011), to support its contention that ECC did not owe a duty to Strittmatter such that Strittmatter may recover from ECC under a tort theory.  In *Presley*, the D.C. Court of Appeals upheld the trial court's judgment as a matter of law *after the conclusion of the presentation of evidence at trial* that a consultant on a construction project charged with monitoring the project owed no common law or statutory duty to a worker who was injured on that job site.  Indeed, in discussing its determination as to the scope of the consultant's undertaking, the D.C. Court of Appeals relied not only the provisions of the contract at issue but also on testimony at trial that elucidated the consultant's actual role while on the job site.  *Presley*, 25 A.3d at 880-82

(summarizing testimony); *id.* at 891 ("Notably, there is no evidence that [the consultant] acted beyond the limited scope of its undertaking at the time of the incident, as its inspectors were not on the site when [plaintiff] was attaching the fan shrouds – nor were they required to be – and did not see the dangerous activity.").

Strittmatter in turns relies on the U.S. Court of Appeals for the District of Columbia Circuit's opinion in *Caldwell v. Bechtel, Inc.*, 631 F.2d 989 (D.C. Cir. 1980).  In *Caldwell*, the D.C. Circuit overturned the trial court's holding at the *summary judgment phase* that a consultant under contract with the Washington Metropolitan Area Transit Authority did not owe a duty of care to a heavy equipment operator at a job site.  In finding as a matter of law that the consultant owed "a duty of due care to take reasonable steps to protect [the plaintiff] from the foreseeable risk of harm to his health posed by the excessive concentration of silica dust in the Metro tunnels," the D.C. Circuit differentiated the importance of the contract language to a claim under tort law as opposed to a contract law claim.  *Caldwell*, 631 F.2d at 1002-03.  Indeed, the D.C. Circuit found "[t]he particular circumstances of this case, including the . . . contract, [the consultant's] superior skills and position, and [the consultant's] resultant ability to foresee the harm that might reasonably be expected to befall appellant, created a duty in [the consultant] to take reasonable steps to prevent harm to appellant from the hazardous conditions of the subway tunnels." *Id.* at 997.  In reaching its finding, the D.C. Circuit noted that the consultant was informed of the particular safety risks at issue in that case, namely the high concentration of silica dust and the inadequate ventilation in the subway tunnels, and not only had the power to protect the plaintiff but was in a superior position to do so. *Id.* at 1002.

As such, when reviewing the Fourth Party Complaint and the attached Professional Services Agreement between ECC and the Owner, the VRAP, and the EHSAP, in the light most

favorable to Strittmatter, the Court finds that Strittmatter has stated plausible claims in tort against ECC. Indeed, the documents reflect that ECC's undertaking as the environmental consultant on the project included making recommendations for appropriate procedures including use of protective equipment, providing ongoing daily monitoring of the VOC levels at the job site, and taking appropriate steps if hazardous conditions were detected.[3] Moreover, the EHASP, which was designed by ECC in part to address the chemical contaminant risk potential during excavation work, was reviewed and approved by Strittmatter. As part of that process, Strittmatter agreed to comply with the provisions of the EHASP. Accordingly, the Court shall deny ECC's request to dismiss portions of the Fourth Party Complaint on the grounds that ECC owed no duty to Strittmatter as a matter of law.

The Court notes that in its opposition Strittmatter makes specific arguments as to the sufficiency of each of its tort claims which do not appear responsive to particular arguments raised in ECC's motion to dismiss. *See* Pl.'s Opp'n at 19-25. However, in its reply brief, ECC alleges that Strittmatter has failed to plead with sufficient specificity ECC's alleged breaches giving rise to its claims. *See* Def.'s Reply at 9-14. A review of the Fourth Party Complaint demonstrates that Strittmatter has provided adequate factual allegations to support each claim. Indeed, Strittmatter's negligence claim is based on ECC's alleged breach of its duty to: (1) "ensure the safety of the H Street Project related to VOC monitoring and emissions testing;" (2) "ensure the safety of the construction workers at the H Street Project from exposure to VOC vapors"; (3) "continuously monitor the VOC vapors released during excavation at the H Street Project and to warn of hazards

---

[3] Strittmatter asserts that ECC should be held to a standard of care imposed on licensed geologists and professional environmental experts because of the ECC professionals' superior skill and authority. The Court declines to address this argument at this time because based on this record, it has not yet determined whether ECC owed a duty of care to Strittmatter.

created by any such vapors;" (4) perform "pursuant to the standards set for an environmental professional and/or a certified professional geologist;" and (5) "institute safety precautions and regulate safety equipment in accordance with the ECC/Owner Contract, the EHASP and the VRAP."  With respect to its indemnity and/or contribution as a joint tortfeasor claim, Strittmatter's claim arises out of ECC's alleged negligence in performing its duties under the contract, the EHSAP, the VRAP, and District of Columbia statutory regulations, and pursuant to the standards identified for a professional engineering consultant and/or a certified professional geologist.  Finally, in its negligent misrepresentation claim, Strittmatter asserts that "ECC directly and indirectly made knowingly and/or recklessly false and misleading statements about the environmental conditions at the H Street Project," failed to perform its duty to monitor environmental conditions, failed to properly evaluate potential hazards related to contaminated soil and groundwater, and breached its duty "when it specifically indicated that respirators were unnecessary protective equipment at the site." The Court finds these allegations sufficient to survive a motion to dismiss as the allegations give ECC fair notice of Strittmatter's claims and the grounds for those claims.  Finally, while ECC points out that Strittmatter only alleges breaches if Plaintiffs succeed, Strittmatter's framing of its claims simply recognizes that it is advancing no cause of action against ECC if the Plaintiffs fail to succeed on their negligence claim.

### B.    ECC's Alleged Contractual Obligations to Strittmatter

The Court next turns to Strittmatter's claim that arises out of contract law.  The parties agree that Strittmatter is not a party to the contract at issue between ECC and the Owner of the project.  Rather, Strittmatter asserts that it is an intended third party beneficiary of the agreement.  "Generally, a stranger to a contract may not bring a claim on the contract." *Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1064 (D.C. 2008).  However, courts

have recognized that a party may have third party beneficiary status even though the party is not in direct privity of contract.  *Id.*  "'Third-party beneficiary status requires that the contracting parties had an express or implied intention to benefit directly the party claiming such status.'"  *Id.* (quoting *Alpine County, Calif. v. United States*, 417 F.3d 1366, 1368 (Fed. Cir. 2005)).  The D.C. Court of Appeals has adopted the approach from the Restatement (Second) of Contracts and recognized the distinction between an *intended* beneficiary, one who has rights to recover under a contract claim, and an *incidental* beneficiary, one who does not have rights to recover under a contract claim.[4]  *Id.*

"'An incidental beneficiary is a person who will be benefited by performance of a promise but who is neither a promisee nor an intended beneficiary.'"  *Id.* at 1064-65 (quoting Restatement (Second) of Contracts § 315, cmt. (a)).  The D.C. Court of Appeals recognized the circumstances under which an entity may be recognized as an intended beneficiary:

> (1)     Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
>> (a) the performance of the promise will satisfy an obligation to pay money to the beneficiary; or
>>
>> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

*Id.* at 1064 (quoting Restatement (Second) of Contracts § 302(1)).

Here, ECC argues that Strittmatter is at most an incidental beneficiary to the agreement between ECC and the Owner because, ECC asserts, there was no express or implied intention on the part of ECC and the Owner to benefit Strittmatter directly .  Indeed, ECC notes that the

---

[4] The Professional Services Agreement indicates: "This Agreement shall be governed by the law of the District of Columbia."  Prof'l Srvs. Agmt. at 8.

Professional Services Agreement does not identify Strittmatter by name and the language of the contract reflects that the parties' purpose in entering into the contract was to obtain a "Case Closure" or "No Further Action" determination pursuant to D.C. Municipal Regulation § 20-6211. While ECC is correct that one task set forth in the "Scope of Services" portion of the contract was to obtain such a determination, the Professional Services Agreement also provides that ECC is tasked with "[e]nvironmental oversight." Prof'l Srvs. Agmt. at 11. Specifically, the agreement states: "[ECC] shall provide Environmental Oversight services as detailed in . . . [ECC's EHASP] for the Project . . . . These services shall include implementation of EHASP/IMMP." *Id.*

It is clear that Strittmatter benefited in some way from the contract between ECC and the Owner, and the EHASP and the VRAP as these plans were prepared, in part, to ensure the health and safety of construction workers during construction. VRAP at 6. The plans were created in light of the documented petroleum hydrocarbon contamination at the site and in contemplation of the potential for discovering unknown underground storage tanks in light of the previous uses for the plot of land at issue. As ECC points out, Strittmatter is not specifically referenced in the Professional Services Agreement. However, Strittmatter, a subcontractor performing excavation work, did review and approve the EHASP and, in doing so, agreed to abide by the safety and health requirements and procedures outlined in the EHASP. *See* 4th Party Compl. ¶ 33; EHASP at 3. In this acknowledgment, Strittmatter also assumed responsibility for compliance with the procedures described in the EHASP.

The issue, then, is whether the circumstances indicate that ECC intended to give Strittmatter the benefit of its promised performance of the services in the contract. The Court finds that based on a review of the contract as a whole, the Court cannot conclude that Strittmatter has failed to make out a plausible contract claim.

ECC points to the D.C. Court of Appeals opinion in *Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055 (D.C. 2008), in support of its assertion that Strittmatter is not an intended beneficiary to the contract between ECC and the Owner. However, the contract in *Fort Lincoln* is distinguishable for two reasons. First, the contract at issue in that case included a provision that stated: "'[e]xcept as otherwise expressly provided in this Agreement (including but not limited to, provisions in favor of the United States in Section 3.3), no person other than a party to the Agreement or a successor or assign, shall have any right to enforce the terms of the Agreement against a party, its successors or assigns." *Fort Lincoln Civic Ass'n Inc.*, 944 A.2d at 1060 (quoting the contract at issue). Other provisions in the contract provided that the United States and an agency of the District of Columbia were beneficiaries of the agreement and lodged with those entities a right to bring judicial enforcement. *Id.* Here, there are no such provisions in the Professional Services Agreement that directly reflect the intent of the parties either by expressly including or excluding entities that could raise a contract claim under the terms of the agreement.

Second, *Fort Lincoln* involved a Land Disposition Agreement entered into by a corporation, a redeveloper, and an agency of the District of Columbia to develop a "multifunctional Town Center," community facilities, secondary and higher education institutions, public parks, recreational facilities, and a variety of housing types in Northeast, Washington, DC. *Id.* at 1059-60. Residents of the area sought to enforce certain contract provisions, arguing that they were intended third party beneficiaries of the Land Disposition Agreement. *Id.* at 1062-63. Ultimately, the court found, "[a]ppellees are incidental [rather than intended] beneficiaries, part of the public and the 16,000 residents of the Fort Lincoln community who might realize some benefit from implementation of the LDA." *Id.* at 1067. In reaching that holding, the court relied at least in part on the Restatement (Second) of Contracts and case law expressly dealing with claims raised by

members of the public to enforce government contracts.  *See id.* at 1065 (""[G]overnment contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested.'") (quoting Restatement (Second) of Contracts § 313 cmt. a); *id.* ("We start with the premise, as we said in *Moore v. Gaither*, 767 A.2d 278 (D.C. 2001), that 'third party beneficiaries of a Government contract are generally assumed to be merely *incidental* beneficiaries, and may not enforce the contract absent clear intent to the contrary.'") (quoting *Moore*, 767 A.2d at 287); *id.* at 1067 (noting as the appellees emphasized, that the LDA was a government contract).  In the instant action, the contract at issue is a private agreement between ECC and the Owner.  Moreover, Strittmatter is bringing claims not as a general member of the public but as a subcontractor on the project.[5]

Here, the Court concludes that it does not have a sufficient record to ascertain the intent of the parties, particularly at this phase when the Court is required construe the complaint in the light most favorable to Strittmatter.  While the Professional Services Agreement did not mention Strittmatter by name, "intent may be 'adduced' if it 'is not expressly stated in the contract.'"  *Fort Lincoln Civic Ass'n Inc.*, 944 A.2d at 1066 (quoting *Roedler v. Department of Energy*, 255 F.3d 1347, 1352 (Fed. Cir. 2001)).  Here, the Professional Services Agreement specified that ECC was

---

[5] ECC also relies on the D.C. Court of Appeals' opinion in *Jahanbein v. Ndidi Condominium Unit Owners Association, Inc.*, 85 A.3d 824 (D.C. 2014), to support its position that ECC has no contractual duty to Strittmatter.  In that case, the court held that one owner of a condominium could not bring a contract claim against the owner of another unit in the building based on the condominium association's bylaws, an agreement between the condo association and the individual owners.  In reaching that conclusion, the court read the bylaws as a whole and found some provisions to be ambiguous.  Ultimately, the court found that "the Bylaws appear intended primarily and directly to benefit the Condo Association and not a third-party unit owner, despite the incidental benefits a third-party unit owner might find in its provisions."  *Id.* at 831.  While this case demonstrates another instance where a court found a party was not an intended third party beneficiary to a contract, the analysis is limited to the provisions of that particular agreement and, as such, the Court does not find it determinative on the issue at hand.

required to provide "environmental oversight" on the project and the VRAP notes one of the purposes of the plan was to ensure the health and safety of construction workers during construction. Moreover, the EHASP, which was reviewed and approved by Strittmatter, set forth health and safety requirements and procedures for the work site specifically to address environmental considerations related to soil and ground water contamination. As part of the EHASP, ECC's Environmental Technician was responsible for a daily monitoring of safety conditions on the site. In the absence of an express provision reflecting ECC's and the Owner's intent and in light of the language of the contract, the VRAP, and the EHASP, the Court concludes that based on this record the issue of whether Strittmatter is an intended or an incidental beneficiary of the agreement between ECC and the Owner is in equipoise. As such, the Court shall deny ECC's request to dismiss the contract claim on the basis that Strittmatter was not an intended third party beneficiary of the agreement.

Finally, the Court notes that ECC contends that even if it did owe a contractual duty or a duty in tort to Strittmatter, Strittmatter's claim still fail because the language of the EHASP rendered Strittmatter and JMAV responsible for Plaintiff Parker's safety. *See generally* Def.'s Mot. at 19-22. However, Strittmatter's allegations are more nuanced than simply alleging that ECC had a duty and contractual obligation to generally ensure Plaintiff Parker's safety on the job site. Rather, Strittmatter's claims against ECC are grounded in ECC's purported failure to adequately manage environmental hazards including monitoring VOC vapors during the excavation, ensuring safety from VOC vapors, and performing its services under the standard set for an environmental professional and/or a certified professional geologist. As such, ECC mischaracterizes Strittmatter's argument that ECC did not execute the services outlined in the agreement with appropriate care and, if Plaintiff Parker succeeds in establishing that he is entitled

to relief, that his injuries were a result of ECC's negligence and its breach of its contractual obligations.

### C.    ECC's Request to Sever Strittmatter's Fourth Party Complaint

Finally, ECC requests that the Court sever the Strittmatter's claims because the Professional Services Agreement between ECC and the Owner contains a jury waiver provision.[6] ECC contends that Strittmatter's claims arise out of or are related to the agreement and, as such, Strittmatter is bound by the jury waiver provision.  ECC requests then that the claims be severed and tried separately in light of the jury waiver provision.

"A court may sever a party from an action if the permissive joinder requirements of Federal Rule of Civil Procedure 20(a) are not met."  *Blount v. United States Sec. Assocs.*, 930 F. Supp. 2d 191, 193 (D.D.C. 2013) (citing Fed. R. Civ. P. 21; *Parks v. District of Columbia*, 275 F.R.D. 17, 18 (D.D.C. 2011)).  The Federal Rules of Civil Procedure allow the joinder of claims by multiple plaintiffs "with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences" and if "any question of law or fact common to all plaintiffs will arise in the action."  Fed. R. Civ. P. 20(a)(1).  "Under the Federal Rules of Civil Procedure, 'the impulse

---

[6] The provision provides:

> THE PARTIES SPECIFICALLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY COURT WITH RESPECT TO ANY CONTRACTUAL, TORTIOUS OR STATUTORY CLAIM, COUNTERCLAIM OR CROSS-CLAIM AGAINST THE OTHER ARISING OUT OF OR CONNECTED IN ANY WAY TO THE PROJECT OR THIS AGREEMENT BECAUSE THE PARTIES HERETO, BOTH OF WHOM ARE REPRESENTED BY COUNSEL, BELIEVE THAT THE COMPLEX COMMERCIAL AND PROFESSIONAL ASPECTS OF THEIR DEALINGS WITH ONE ANOTHER MAKE A JURY DETERMINATION NEITHER DESIRABLE NOR APPROPRIATE.

Prof'l Srvs. Agmt. at 8-9.

is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged.'" *Blount*, 930 F. Supp. 2d at 193 (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966)). The prongs of Rule 20(a) "'are to be liberally construed in the interest of convenience and judicial economy . . . in a manner that will secure the just, speedy, and inexpensive determination of th[e] action.'" *Spaeth v. Michigan State Univ. Coll. of Law*, 845 F. Supp. 2d 48, 53 (D.D.C. 2012) (quoting *Davidson v. Dist. of Columbia*, 736 F. Supp. 2d 115, 119 (D.D.C. 2010)).

Here, Strittmatter's claim arise out of the same occurrence, namely Plaintiff Parker's purported exposure to toxic chemicals from leaking underground storage tanks while he was performing excavation work on December 18, 2014, and involve common questions of law and fact, namely whether Plaintiff Parker has prevailed on his claims and, if so, which parties are liable for his damages. As such, the Court shall deny the request to sever Strittmatter's claims at this time in favor of convenience and judicial economy. To the extent that the Court determines that the jury waiver provision is applicable to Strittmatter's claims, it appears that the claims may still be heard together and that determinations as to liability, if necessary, on Strittmatter's claims may be made by the Court.

Pursuant to this Court's Order of June 6, 2016, the Court suspended all discovery deadlines until the resolution of the instant motion. Order (Jun. 6, 2016), ECF No. [45]. Pursuant to that Order, the parties filed a Joint Submission Regarding the Scheduling Order setting forth agreed-upon discovery dates after the resolution of the instant motion. Jt. Submission Regarding Scheduling Order, ECF No. [55]. The parties subsequently filed a Joint Status Conference Report for Hearing on November 30, 2016,[7] in which Plaintiffs and JMAV proposed different dates for

---

[7] The Court continued the November 30, 2016, hearing, to January 18, 2017.

discovery. Jt. Status Conf. Report for Hrg. of Nov. 30, 2016, ECF No. [60]. The Court previously set this matter for a Status Hearing on January 18, 2017, at 10:00 a.m. The Court shall convert this hearing to a further Initial Scheduling Conference to set additional dates in this matter.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Third Party Defendant/Fourth Party Plaintiff Strittmatter's [54] Motion *Nunc Pro Tunc* for Leave to File Its Fourth-Party Complaint Against ECC and DENIES Fourth Party Defendant ECC's [48] Motion to Dismiss the Fourth-Party Complaint. The Court has determined that Strittmatter has pled plausible claims against ECC both in contract and in tort and that ECC is not entitled to a dismissal of the claims based on this record.

An appropriate Order accompanies this Memorandum Opinion.

                                                            /s/
                                                    COLLEEN KOLLAR-KOTELLY
                                                    United States District Judge